IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 1:21-cr-282 (LO) |
| DIANE D. STURGIS, | |
| Defendant. | |

## STATEMENT OF FACTS

The United States and the defendant, DIANE D. STURGIS (hereinafter "the defendant" or "STURGIS"), agree that the allegations in the one-count criminal information and the following facts are true and correct and that, at trial, the United States would have proven the following facts beyond a reasonable doubt with admissible and credible evidence:

**A.     Background**

1.       The Broadcasting Board of Governors ("BBG") was an independent federal agency that oversaw public service media networks, including Voice of America ("VOA"). The BBG changed its name to the U.S. Agency for Global Media in or about August 2018.

2.       Defendant DIANE D. STURGIS was a contract specialist and contracting officer for the BBG's International Broadcast Bureau, Office of Contracts from in or about November 2007 until in or about late 2017. The Office of Contracts was responsible for soliciting, negotiating, awarding, and administering all agency contracts. STURGIS was a "public official" as defined by 18 U.S.C. § 201(a)(1).

3.       PERSON A was STURGIS's relative. PERSON A resided in New Jersey.

4.      Company 1 was a Pennsylvania corporation that provided staffing services to the BBG.  Company 1 was located in the Eastern District of Virginia.

5.      Company 2 was a Virginia corporation that provided staffing services to the BBG.  Company 2 was located in the Eastern District of Virginia.

6.      RITA M. STARLIPER was Company 1's owner, chief executive officer, and president.

7.      PERSON B worked for Company 2, one of Company 1's competitors, and, for several months in or about 2014 and 2015, was discreetly working for Company 1 at the same time.  PERSON B continued to work with Company 1 after Company 2 terminated PERSON B in or about April 2015.

8.      The BBG supplemented its multimedia staff with hundreds of consultants and contractor personnel.  To reduce the burden of staffing and managing positions filled by contractor personnel, the BBG, beginning in or about 2014, outsourced this responsibility to government vendors offering professional staffing services.

9.      On or about May 28, 2014, the BBG issued a pre-solicitation notice for Request for Proposal ("RFP") No. BBG50-R-0528, which called for staffing services for up to 700 contractor personnel working primarily with the VOA.  STURGIS was the contracting officer for this procurement.

10.     On or about September 30, 2014, STURGIS, in her role as contracting officer for the BBG, awarded two staffing contracts to Company 2 covering a large portion of the BBG's contractor personnel.  Company 2's contracts were valued at approximately $117 million.  The contracts had a one-year base period of performance and four, one-year options that could be exercised by the BBG.

**B.**     **The Scheme to Defraud and Commit Bribery**

11.     Beginning no later than in or about late 2014 and continuing thereafter until at least in or about mid to late 2016, in the Eastern District of Virginia and elsewhere, the defendant, DIANE D. STURGIS, PERSON B, STARLIPER, PERSON A, and others known and unknown, knowingly and unlawfully conspired to defraud and engage in bribery and honest services mail fraud.  STURGIS used her position as a BBG contract specialist and contracting officer at least in part to benefit and enrich STARLIPER, PERSON B, PERSON A, and Company 1 through bribery and fraud.

12.     STURGIS and the co-conspirators executed the scheme in the following manner and means, among others.  Between in or about late 2014 or early 2015 and in or about mid to late 2016, PERSON B and STARLIPER offered and gave, and STURGIS accepted, things of value for PERSON A, including payments for a job involving minimal work, in exchange for official actions and preferential treatment in the awarding, modifying, administering, and influencing of BBG staffing contracts / task orders and modifications awarded to Company 1. STURGIS performed the official acts benefitting Company 1 as opportunities arose.

13.     Between in or about late 2014 and in or about July 2015, PERSON B acted together with STURGIS, STARLIPER, Company 1, and others to obtain for Company 1 at least a portion of the BBG staffing contracts previously awarded to Company 2.

14.     At various times between in or about February 2015 and in or about June 2016, PERSON B, STARLIPER, and Company 1 attempted to conceal PERSON A's employment with Company 1 and the payments to PERSON A.

15.     STURGIS and the co-conspirators took the following steps, among others, in the Eastern District of Virginia and elsewhere to further the conspiracy.   Between in or about late

2014 and in or about early 2015, PERSON B forwarded a series of e-mails from Company 2 to a

personal e-mail account, with attachments and information that included Company 2's pricing

data, cost examination, and labor spreadsheets with the BBG, internal discussions between the

BBG and Company 2, and Company 2 templates.  PERSON B forwarded or copied STARLIPER

on some of the e-mails.

16.     Between in or about late 2014 and in or about early 2015—at or near the time that

STURGIS advised Company 2 that the BBG had decided not to exercise Company 2's first-year

option—STURGIS and PERSON B discussed a job for PERSON A.  Specifically, PERSON B

offered to give a job to PERSON A.  PERSON B and STARLIPER subsequently agreed to offer

a position with Company 1 to PERSON A.

17.     On or about February 2, 2015, STURGIS, using her personal e-mail account, sent

PERSON A's resume to PERSON B.  PERSON B then forwarded the resume and STURGIS's e-

mail to STARLIPER.

18.     In or about February 2015, STURGIS, PERSON B, and STARLIPER attempted

to cause Company 2 to novate its BBG staffing contracts to Company 1 or enter into a business

relationship with Company 1 regarding Company 2's staffing contracts with the BBG.

19.     In or about February 2015, STURGIS told PERSON B that if Company 2 would

not novate the staffing contracts, BBG would recompete the staffing contracts using the U.S.

General Services Administration ("GSA"), allowing Company 1, PERSON B, and STARLIPER

adequate time to apply for a GSA Schedule Contract with labor categories specifically designed

to meet the BBG's requirements.

20.     On or about February 3, 2015, PERSON B sent an e-mail to STURGIS attaching

a GSA contacts list relating to Company 1's application for the GSA Schedule Contract.

STURGIS replied, "Do I need to contact GSA?"  PERSON B answered, "Yes, this way they

understand the urgency."

      21.     On or about February 4, 2015, STURGIS sent an e-mail to a GSA employee,

expressing urgency regarding Company 1's application for a GSA Schedule Contract:

> My name is Diane Sturgis [sic] I work for the Broadcasting Board
> of Governors as a contracting officer, I've been working with
> [STARLIPER] about getting specific labor categories under
> [Company 1's] GSA schedule.  This request has become urgent,
> [sic] we would like to contract for these specific labor categories
> by next month.  Do [sic] to the urgency of need it would not be
> possible to issue a formal solicitation/synopsis at this time.  If you
> can provide assistance in this matter [sic] I would much appreciate
> it.  I would like to speak you about this matter at your earliest
> convenience.  Please contact me at the number below.

      22.     On or about February 6, 2015, STURGIS, using her personal e-mail account, sent

two e-mails to PERSON B, providing PERSON B with the new e-mail address for PERSON A

and asking PERSON B to have Company 1 forward its e-mail regarding a job offer for PERSON

A to the correct e-mail address.

      23.     On or about February 9, 2015, STURGIS sent an e-mail to PERSON A, attaching

PERSON A's resume.  PERSON A did not create the resume.  The resume included inaccurate

information regarding PERSON A's background and professional experience.

      24.     On or about February 9, 2015, STARLIPER sent an e-mail to PERSON A stating

that STURGIS had provided STARLIPER with PERSON A's new e-mail address.  STARLIPER

stated in part, "was wondering if you had a few minutes tonight to talk about a position."

      25.     Between on or about February 9, 2015 and on or about February 15, 2015,

STARLIPER and PERSON A exchanged a series of e-mails about a position with Company 1.

In one e-mail, PERSON A stated, "Hi [STARLIPER], I didn't get a chance to confirm the pay

rate wit[h] you.  I know [STURGIS] told me 25 an hr but [I] wanted to make sure it was still the same."

26.     On or about February 15, 2015, STARLIPER sent an e-mail to PERSON A, attaching a consulting agreement.  PERSON A and STARLIPER, on behalf of Company 1, executed the agreement.

27.     On or about February 19, 2015, PERSON B sent an e-mail to STURGIS with the e-mail address for the GSA employee assigned to Company 1's application.

28.     Between on or about February 19, 2015 and on or about March 2, 2015, STURGIS contacted the GSA employee to express urgency for the review and approval of Company 1's application for the GSA Schedule Contract.

29.     Between on or about February 20, 2015 and in or about early May 2015, STURGIS, in her official capacity, attempted to prohibit Company 2 from terminating PERSON B after Company 2 learned that PERSON B had an organizational conflict of interest because he was discreetly working for Company 1 while employed by Company 2.

30.     On or about February 24, 2015, STARLIPER and PERSON B caused a Company 1 check in the amount of $2,000 to be issued and sent to PERSON A by mail or courier.

31.     On or about March 2, 2015, PERSON A forwarded an e-mail to STURGIS's personal e-mail account.  The forwarded e-mail, which STARLIPER sent to PERSON A, indicated that Company 1 had shipped a computer to PERSON A.  STARLIPER instructed PERSON A to monitor a federal contracting website (www.FedBizOpps.gov) for contracting opportunities and create a basic Excel spreadsheet to list the opportunities.

32.     On or about March 2, 2015, STURGIS set up the Excel spreadsheet for PERSON A and then sent it to PERSON A as a reply e-mail attachment.

33.     On or about March 11, 2015, STARLIPER and PERSON B caused a Company 1 check in the amount of $2,000 to be issued and sent to PERSON A by mail or courier.

34.     On or about March 12, 2015, STARLIPER sent an e-mail to PERSON A advising that PERSON A's paycheck had been sent by mail.

35.     Between on or about March 18, 2015 and on or about March 23, 2015, after the GSA awarded Company 1's GSA Schedule Contract, STARLIPER circulated the approved GSA price schedule to BBG personnel, including STURGIS.

36.     On or about March 26, 2015, STARLIPER and PERSON B caused a Company 1 check in the amount of $2,000 to be issued and sent to PERSON A by mail or courier.

37.     On or about March 31, 2015, STURGIS sent several e-mails to and from her BBG e-mail account, copying her personal e-mail account.  The e-mails attached contract modifications and spreadsheets for labor costs for different categories of contractor personnel.

38.     Between in or about April 2015 and in or about May 2015, Company 1 and PERSON B possessed and drafted (or commented on) portions of the BBG's instructions for the recompete RFQ and other internal documents at least a month before the BBG issued the RFQ to Company 2 and other competitors.

39.     On or about April 19, 2015, PERSON B sent an e-mail to another employee at Company 1 attaching a draft of the RFQ's "Instructions to Offerors," including the evaluation factors and proposal preparation requirements.  PERSON B stated, "Can you please [take] a look at the attached and see if there are any other changes that you suggest.  I am trying to avoid anyone asking questions.  Don't worry about formatting.  This happened when I converted it and did not fix it prior to making comments."

40.     On or about April 22, 2015, STARLIPER and PERSON B caused a Company 1 check in the amount of $2,000 to be issued and sent to PERSON A by mail or courier.

41.     On or about April 27, 2015, PERSON B sent an e-mail to another at Company 1 soliciting comments regarding a draft version of a BBG notification regarding the recompete process.

42.     On or about May 6, 2015, STARLIPER and PERSON B caused a Company 1 check in the amount of $2,000 to be issued and sent to PERSON A by mail or courier.

43.     On or about May 13, 2015, PERSON B, STARLIPER, and another at Company 1 sent e-mails in which they circulated drafts of a portion of Company 1's proposal for the BBG's staffing contracts, more than a week before STURGIS issued the RFQ for those staffing contracts to all eligible bidders.  One of the e-mails to PERSON B stated, "Nice work on that last paragraph.  Think anyone will know it's us?"

44.     On or about May 19, 2015, after PERSON B and another employee at Company 1 helped draft an announcement or statement explaining the BBG's justification for recompeting the contract through a GSA task order, STURGIS sent an e-mail to Company 2 and other vendors announcing the decision to use a GSA task order.

45.     On or about May 20, 2015, after the BBG issued Request for Quote ("RFQ") No. BBG50-Q-15-0040 (to recompete the staffing contracts held by Company 2), STURGIS sent an e-mail to STARLIPER attaching the RFQ and related solicitation documents and stating in part, "Attached is SF 18 Request for Quote, the attached documents is [sic] to be issued solely under your GSA schedule contract."  The RFQ was limited to those government contractors that had submitted bids for the original RFP issued by the BBG in or about June 2014, and the RFQ required vendors to have a Schedule Contract with the GSA.

46.     On or about May 20, 2015, STARLIPER and PERSON B caused a Company 1 check in the amount of $2,000 to be issued and sent to PERSON A by mail or courier.

47.     Between on or about May 24, 2015 and on or about May 25, 2015, Company 1, PERSON B, and STARLIPER submitted false and fraudulent responses to questionnaires that were supposed to be completed by entities listed in the past performance section of Company 1's bid proposal.  For instance, Company 1, PERSON B, and STARLIPER listed a fake name and used a fake signature for Company 1's "point of contact" on two of the past performance questionnaires; Company 1, PERSON B, and STARLIPER fraudulently ranked Company 1's performance and filled out narrative responses on behalf of individuals purportedly associated with the entities listed in Company 1's past performance submission; and Company 1, PERSON B, and STARLIPER forged the signature of the founder of the nonprofit organization with which Company 1 falsely claimed it had previously had a staffing contract.

48.     On or about May 29, 2015, Company 1, PERSON B, and STARLIPER submitted Company 1's bid in response to the BBG's recompete RFQ for the staffing contracts.  Company 1's bid proposal included false and fraudulent representations in the "past performance" section. For example, Company 1 falsely and fraudulently represented that it had previously received a staffing contract valued at more than $7 million with a different company owned by STARLIPER.  Similarly, Company 1 falsely and fraudulently represented that it was "under contract" with a nonprofit organization to provide staffing services valued at more than $2 million.

49.     Between in or about May 20, 2015 and in or about June 29, 2015, STURGIS and PERSON B continued to coordinate and communicate with each other regarding the recompete RFQ, including through STURGIS's personal e-mail account.

50.     Between in or about May 20, 2015 and in or about June 29, 2015, STURGIS

rejected the evaluation performed by BBG's technical evaluation panel, overrode her Senior

Contracting Officer's GSA Schedules compliance determination, and found that all offerors

other than Company 1 were ineligible to receive the BBG's staffing contracts.

51.     On or about June 3, 2015, STARLIPER and PERSON B caused a Company 1

check in the amount of $2,000 to be issued and sent to PERSON A by mail or courier.

52.     On or about June 5, 2015, STURGIS, using her personal e-mail account, sent an

e-mail to PERSON B attaching confidential government information regarding a competitor's

bid for the RFQ and draft internal evaluation worksheets for the RFQ.

53.     On or about June 18, 2015, STARLIPER and PERSON B caused a Company 1

check in the amount of $2,000 to be issued and sent to PERSON A by mail or courier.

54.     On or about June 22, 2015, STURGIS notified Company 1 that it had been

awarded a portion of Company 2's contracts.

55.     On or about June 29, 2015, STURGIS signed a Task Order awarding

approximately $1,845,900 to Company 1, relating to staffing services for approximately 300

contractor personnel.  Pursuant to its contract, Company 1 received several additional task orders

from the BBG between in or about 2015 until in or about 2018 or 2019.

56.     On or about June 30, 2015, STARLIPER and PERSON B caused a Company 1

check in the amount of $2,000 to be issued and sent to PERSON A by mail or courier.

57.     Between in or about July 2015 and in or about July 2016, STARLIPER, PERSON

B, and Company 1 continued to make periodic payments to PERSON A from personal bank

accounts and Company 1's bank account.

58.     On or about April 11, 2016, STARLIPER and PERSON B caused a Company 1 check in the amount of $6,153 to be issued and sent to PERSON A by mail or courier for the purpose of paying PERSON A's outstanding tax bill.

59.     On or about September 16, 2016, STARLIPER attempted to conceal PERSON A's identity from Company 2 by requesting that Company 1's counsel in a civil lawsuit between Company 1 and Company 2 not release PERSON A's name.

## C.     Conclusion

61.     This statement of facts includes those facts necessary to support the plea agreement between the defendant and the United States.  It does not include each and every fact known to the defendant or to the United States, and it is not intended to be a full enumeration of all the facts surrounding the defendant's case.

62.     The actions of the defendant, as recounted above, were in all respects knowing and deliberate, and were not committed by mistake, accident, or other innocent reason.

Respectfully submitted,

Jessica D. Aber
United States Attorney

Corey R. Amundson
Chief, Public Integrity Section

By:     _Esullivi_____

Edward P. Sullivan
Special Assistant United States Attorney (LT)
Senior Litigation Counsel, Public Integrity Section
Jordan Dickson
Trial Attorney, Public Integrity Section
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel:  703-299-3700
Edward.P.Sullivan@usdoj.gov
Jordan.Dickson@usdoj.gov

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, Diane D. Sturgis, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____
Diane D. Sturgis
Defendant


I am Diane D. Sturgis's attorney.  I have carefully reviewed the above Statement of Facts with him.  To my knowledge, her decision to stipulate to these facts is an informed and voluntary one.

_____
Joni C. Robin, Esq.
Attorney for Diane D. Sturgis